UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

DONALD J. MURRAY; DOMINICK D'AMORE; LEE
ADAMS; LINDA EDWARDS; LINDA MATTHEWS;
LORETTA SHELLING, MARK SUTTER; JOSEPH
ANNORINO; FRED BORDEN; WILLIAM DALE; CINDY
ROBERT; DONALD CLARK; DIANE CRANDALL; FAY
KIMBALL; ROBERT BRACE; WALT LEROY; DANIEL F.
MACDONALD; and WILLIAM D. BARBEAU,

                                Plaintiffs,              5:07-CV-0147
                                                        (GTS/GHL)
v.

NINE MILE POINT NUCLEAR STATION, LLC; LOCAL
UNION 97 OF THE INT'L BHD. OF ELEC. WORKERS;
CONSTELLATION GENERATION GROUP;
CONSTELLATION ENERGY COMMODITIES GROUP,
INC.; CONSTELLATION ENERGY CORP.;
CONSTELLATION ENERGY GROUP, INC.;
CONSTELLATION ENERGY PROJECTS & SERVS.
GROUP, INC.; CONSTELLATION ENERGY SOURCE, INC.;
XYZ CORP.; and NINE MILE POINT PENSION PLAN,
                                Defendants.
_____

APPEARANCES:                            OF COUNSEL:

SUGARMAN LAW FIRM                       LAURA L. SPRING, ESQ.
  Counsel for Plaintiffs
211 West Jefferson Street
Syracuse, NY 13202

BLITMAN & KING,  LLP                    DONALD D. OLIVER, ESQ.
  Counsel for Defendant Local Union 97 of the
  Int'l Bhd. of Elec. Workers
One Lincoln Center
Syracuse, NY 13202-1355

HISCOCK & BARCLAY, LLP                  LAURENCE B. OPPENHEIMER, ESQ.
  Counsel for Remaining Defendants
3 Fountain Plaza
1100 M&T Center
Buffalo, NY 14203-1414

HON. GLENN T. SUDDABY, United States District Judge

## DECISION and ORDER

Currently before the Court in this employee benefits action filed by the eighteen above-captioned Plaintiffs ("Plaintiffs") against Local Union 97 of the International Brotherhood of Electrical Workers ("Union Defendant") and the nine remaining above-captioned Defendants ("Employer Defendants") are (1) Union Defendant's motion for summary judgment (Dkt. No. 73), (2) Plaintiffs' cross-motion for summary judgment (Dkt. Nos. 79), and (3) Employer Defendants' cross-motion for summary judgment (Dkt. No. 81).  For the reasons set forth below, Union Defendant's motion is granted, Employer Defendants' cross-motion is granted, Plaintiffs' cross-motion is denied, and Plaintiffs' Amended Complaint is dismissed in its entirety.

## TABLE OF CONTENTS

I.    RELEVANT BACKGROUND.................................................................................3
      A.   Plaintiffs' Claims.....................................................................................3
      B.   Undisputed Material Facts.......................................................................5
      C.   Union Defendant's Motion for Summary Judgment.............................13
      D.   Employer Defendants' Cross-Motion for Summary Judgment............14

      E.   Plaintiffs' Cross-Motion for Summary Judgment................................15

II.   RELEVANT LEGAL STANDARDS................................................................18
      A.   Legal Standard Governing Motions for Summary Judgment..............18
      B.   Legal Standards Governing Plaintiffs' Claims....................................18

III.  ANALYSIS.........................................................................................................19
      A.   Plaintiffs' Common-Law Claims of Negligent and Fraudulent
           Misrepresentation and Breach of Duty..................................................19
      B.   Plaintiffs' Two Claims Under Section 301 of LMRA..........................22
      C.   Plaintiffs' ERISA Claim........................................................................32

## I.      RELEVANT BACKGROUND

### A.      Plaintiffs' Claims

Plaintiffs' Amended Complaint asserts the following six claims against Defendants: (1) breach of the collective bargaining agreement; (2) fraudulent misrepresentation; (3) negligent misrepresentation; (4) breach of the duty of fair representation under the National Labor Relations Act ("NLRA") against Union Defendant; (5) violation of Section 301 of the Labor Management Relations Act ("LMRA"); and (6) breach of fiduciary duty pursuant to the Federal Employee Retirement Income Security Act of 1974 ("ERISA") against Employer Defendants. (*Id*.)  Familiarity with the remaining factual allegations supporting these claims in Plaintiffs' Amended Complaint is assumed in this Decision and Order, which is intended primarily for review by the parties.  (Dkt. No. 16.)

Generally, these claims arise from the following factual allegations: (1) on or about November 7, 2001, Union Defendant and Defendant Nine Mile Point Nuclear Station, LLC, entered into a Collective Bargaining Agreement ("the old CBA"), which was set to expire on or about July 1, 2006; (2) meanwhile, Employer Defendants were employing Plaintiffs full time at Nine Mile Point Nuclear Station; (3) at the time, Employer Defendants maintained for Plaintiffs an employee severance plan, separation allowance plan, pension plan, health care plan, and retirement plan; (4) under the old CBA, full-time regular employees who retired were eligible for, among other things, medical benefits; (5) in or about May 2006 "Defendant[] Nine Mile Point Nuclear Station, LLC, and the [Union Defendant] were engaged in negotiations for a new [CBA] set to begin on or about June 1, 2006"; (6) at the time, Plaintiffs were members of the Local Union 97 of the International Brotherhood of Electrical Workers ("Local 97" or "Union");

(7) in or about May of 2006, "[Employer] Defendants . . . began holding exit interviews with Plaintiffs"; (8) during those interviews, Union and Employer Defendants "misrepresented to Plaintiffs that if they did not retire with an effective date of June 1, . . . they would lose certain benefits[,] . . . includ[ing] . . . medical benefits," and that they "must be off-site by May 31, 2006 [to be eligible for the benefits afforded by the old CBA]"; (9) in reliance on these misrepresentations, Plaintiffs accepted early retirement, and were therefore not eligible to receive any of the benefits under the new CBA; (10) "Defendants extended the benefits of the [old CBA] under the new collective bargaining agreement that took effect on or about July 1, 2006" ("the new CBA"); (11) "Defendants enhanced retirement benefits under the new [CBA] included, among other things, a severance package [for which Plaintiffs were not eligible]"; (12) "[a]fter becoming aware of the misrepresentations Plaintiffs detrimentally relied on, Plaintiffs . . . asked [Employer] Defendants to rescind their retirement and . . . reinstate[ them and/or provide them with] the additional benefits they would have received if they had retired under the new [CBA]"; (13) "[Employer] Defendants refused to reinstate Plaintiffs and refused to provide [them] with the new enhanced benefits they would have received had they retired under the new [CBA]"; and (14) "[Union] Defendant filed a grievance regarding Plaintiffs staying employed until the end of the term of the [old CBA, but then] . . . wrongfully withdr[ew] . . . [that grievance]." (*Id.*)

Familiarity with the remaining factual allegations supporting Plaintiffs' claims is assumed in this Decision and Order, which is intended primarily for review by the parties. (*Id.*)

**B.**     **Undisputed Material Facts**

**1.**     **Formation of the Old CBA**

The following is a general summary of material facts that are undisputed by the parties. (*Compare* Dkt. No. 73, Attach. 1 [Union Def.'s Rule 7.1 Statement] *with* Dkt. No. 80, Attach. 18 [Plfs.' Rule 7.1 Statement] *with* Dkt. No. 81, Attach. 1 [Employer Defs.' Rule 7.1 Statement].)

Local 97 has represented employees at Nine Mile Point Nuclear Station ("Nine Mile") located in Oswego, New York, including Plaintiffs, for more than forty years.[1]  In 2001, following the New York State Public Service Commission's order that Niagara Mohawk Power Corporation ("Niagara Mohawk") divest itself of its generating assets, Constellation Nuclear, LLC ("Constellation") purchased Nine Mile.  In March 2001, Constellation negotiated and entered into a Memorandum of Agreement ("MOA") with Local 97 concerning its assumption and extension of the 1996 Niagara Mohawk Agreement and the transition of workers to employment with Constellation.  Under the MOA, Constellation agreed to establish the Nine Mile Point Pension Plan (the "Pension Plan"), which was a defined benefit pension plan sponsored by Constellation for the Niagara Mohawk employees who elected to become Constellation employees.

Nuclear bargaining unit employees who had elected to transition to Constellation were covered under the March 9, 2001 MOA, the 1996 Niagara Mohawk Agreement, and Articles IX and XX of the 2001 Niagara Mohawk Agreement together with a Cash Balance Memorandum of Agreement.  After the purchase of the nuclear facilities by Constellation was finalized and

---

[1]        As of February 2006, Local 97 served as the bargaining representative of approximately 700 employees at Nine Mile.

closing took place, various provisions in these documents were consolidated, streamlined and incorporated by the parties into a single document–the 2001 Constellation Collective Bargaining Agreement (a/k/a "the old CBA"), which was scheduled to expire on or about June 30, 2006. Under the old CBA, each Plaintiff was a participant in the Pension Plan, and was also eligible to participate in a health plan administered by Constellation (which included retiree health coverage), and receive a separation allowance severance plan (which provided severance pay in the event of involuntary separation).

## 2.    Pre-Negotiation Talks Regarding New CBA

Because the old CBA was set to expire on or about June 30, 2006, preparation for negotiations for a new contract began in the early part of 2006.  In February 2006, contract proposal forms were distributed to the membership by the Union Stewards at Nine Mile.  The membership was directed to submit proposals to Local 97 by April 7, 2006.

At a meeting conducted on or about February 2, 2006, Constellation informed Local 97 that, based in part on a staffing study, a reduction in the Nine Mile workforce was appropriate.[2] In response, Local 97 Business Manager David Falletta and Local 97 Vice President Martin Currier presented Local 97's position at the meeting.  Local 97's position was that Nine Mile was properly staffed and layoffs were not necessary; however, if a reduction in the workforce was implemented by Constellation, the reduction should be voluntary.  Further, Local 97 took the position at the meeting that any reduction would be subject to the restrictions contained in the old CBA, which stated that "the Company shall determine whether a reduction in the work force

---

[2]      Constellation was targeting somewhere between 125 and 155 bargaining unit positions for elimination, with the layoff scheduled to take place in the third quarter of 2006.

is necessary[, but] . . . no regular employee hired prior to 11/7/01 who has ten (10) or more years of continuous service shall be laid off because of lack of work nor shall their rate of pay be reduced thereby."[3]

On or about February 23, 2006, Local 97 disseminated the information regarding Constellation's planned reduction in work force to represented employees.  In addition, Local 97 prepared a voluntary early retirement plan proposal ("VERP"), whose purpose was to provide a monetary incentive for senior employees to voluntarily leave Constellation.[4]  In April 2006, Local 97 provided Constellation with a cost analysis of the VERP.  Around the same time, Local 97's Negotiating Committee ("Union Committee") also screened bargaining proposals presented by the membership.

### 3.     Dispute Regarding Retirement-Notification Deadline

In late April 2006, Vice President Currier learned that Constellation was notifying represented employees contemplating retirement that they had to retire by May 31, 2006, to receive the retirement benefits provided in the old CBA, scheduled to expire on June 30, 2006. In response, from late April 2006 going forward, Local 97 made bargaining unit personnel aware that there was an ongoing dispute between Constellation and Local 97 regarding when an individual could retire and receive the benefits provided in the old CBA.  In addition, Vice President Currier drafted a grievance regarding the retirement notification date ("Retirement

_____

[3]     This language, which is commonly referred to as the "Security Clause," was carried over from the 1996 Niagara Mohawk Agreement and had appeared in successive collective bargaining agreements since 1958. Local 97 interpreted the Security Clause to absolutely protect employees with ten (10) or more years of service from involuntary separation.

[4]     The Union believed that, if Constellation agreed to the VERP and enough members accepted the package, involuntary layoffs could be avoided.

Grievance"), which was to be presented to Constellation on May 10, 2006, the scheduled date for the exchange of contract proposals.[5]

The issue presented in the grievance was one of general contract interpretation. Thus, consistent with Local 97's past practice and procedure, the grievance was filed on behalf of the entire 700 person bargaining unit and not on behalf of any one individual.

On May 5, 2006, a letter was distributed to the membership regarding the upcoming negotiations and the retirement notification dispute. The letter informed members of the following: (1) the Union Committee was finalizing contract proposals to exchange with Constellation on May 10, 2006; (2) the foundation of the proposals was to continue in securing wages, benefits and job security rights; (3) negotiations would commence between May 16, 2006, and May 18, 2006, and would continue Tuesdays through Thursdays through June 1, 2006, and then Mondays through Fridays through the month of June 2006; (4) the Vice President would keep them apprised of as much information as he could during this process, bearing in mind the confidentiality of negotiation discussions to both parties, and the fact that nothing would be final until a tentative agreement was reached and ratified by the membership;[6] (5) there would be contingency plans in place to initiate should a tentative agreement not be reached by the expiration, or any extension, of the old CBA; (6) there was a disagreement between Local 97

---

[5]       The Retirement Grievance stated that "[Constellation] had implemented a notification of retirement date that is thirty (30) days prior to the expiration of the current Collective Bargaining Agreement." According to the grievance, the action forced "employees who are contemplating retiring under the terms of the [old] CBA to make their notification to [Constellation] sooner than the rights provided to them through the term of the [old] CBA."

[6]       Local 97 and Constellation entered into a confidentiality agreement at the start of bargaining. Accordingly, very little, if any, substantive information could be provided to the membership regarding negotiations.

and Constellation regarding the date in which an employee could give notice of retirement under the terms of the old CBA, with Local 97 maintaining the date to be June 30, 2006, and Constellation believing the date to be May 31, 2006; (7) although the Union Committee would continue discussions with Constellation on May 10, 2006, regarding this matter, if they continued to disagree on the date through May 31, 2006, any individuals who were contemplating retirement under the terms of the old CBA would have to decide whether they would follow Constellation's date of notification or notify Constellation of retirement after their cut off date and be a part of a dispute through the grievance process;[7] and (8) a grievance would be filed if the issue remained unresolved.

Shortly thereafter, some bargaining unit members considering retirement contacted Local 97 regarding the retirement notification date and whether they should retire.  Consistent with the letter of May 5, 2006, to the membership, they were told that there was an ongoing dispute between Constellation and Local 97 regarding the retirement notification date, and that Local 97 was pursuing the retirement notification issue through the grievance process and negotiations. Further, employees were told that they would have to make their own retirement decision based on personal circumstances.

On May 10, 2006, the Union Committee and Constellation's negotiating committee ("Employer Committee") met to exchange proposals.[8]  Local 97's proposals included the

---

[7]     An arbitration hearing and decision would not have been possible prior to May 31, 2006, Constellation's retirement notification deadline.

[8]     Consistent with Local 97's past practice in its negotiations with other employers, Union Committee and Employer Committee stipulated that the proposals would be distributed to the membership.

continuation of retiree medical benefits and the VERP.  Local 97 also presented the Retirement

Grievance to Constellation, and, in an attempt to expedite the processing of grievances, proposed

the resolution of all pending grievances.  Included in Constellation's proposals was a demand to

eliminate the "10 year security clause."  At the time of the negotiations, there were

approximately 115 security guards in the unit.

### 4.      Commencement of Formal Negotiation Regarding New CBA

On May 16, 2006, Constellation and Local 97 held their first bargaining session.

Constellation submitted an additional proposal that sought to eliminate retiree medical benefits.

In addition, a detailed discussion of the Retirement Grievance took place, during which time

Local 97 aggressively pushed its position that an individual's retirement date should be the date

that the person actually retired.[9]  However, Constellation maintained its position that an

individual's effective retirement date is the first of the month following the date that an

individual retires.[10]

On this same day, after these discussions, Constellation formally denied the Retirement

Grievance in writing at Step One, stating that the issue raised was "not subject to grievance and

arbitration procedure."  However, similar to most grievance procedures, Constellation and Local

97 had a multi-step process for resolving disputes.

---

[9]      Local 97 argued that Constellation had inherited the Niagara Mohawk contract as well as the language in the Niagara Mohawk Pension Plan and Summary Plan Description. Local 97 believed those documents supported the position that an individual had until the last day of the contract–in this case, June 30, 2006–to retire under that contract.

[10]      Local 97 also stressed the need to resolve the issue in a timely fashion because, given Constellation's position, individuals contemplating retirement would have to retire by May 31 to be certain that they would obtain benefits under the old CBA.

Consistent with Local 97's practice in handling grievances during bargaining with employers, the grievance did not proceed to a formal Step Two. Instead, the grievance remained open after the initial denial, and Local 97 immediately pursued it through negotiations the next day. However, in substance, the grievance discussions held at the bargaining table were no different than what would have occurred at Steps Two or Three in the grievance procedure. At both steps, representatives from Constellation and Local 97 attempt to resolve the dispute through discussions, which is what occurred during the negotiations in question.

On May 31, 2006, there was no agreement on retiree medical benefits or a severance package. In fact, no agreement had been reached on any substantive issue as a result of the hangup involving the Security Clause.[11] Nonetheless, a majority of the retirement eligible members decided to remain employed.[12] However, thirty-six (36) members, including Plaintiffs, decided to retire.

During the first week of June 2006, negotiations were effectively stalled and the parties "walked away" from the table. Local 97 requested the assistance of the Federal Mediation and Conciliation Services ("FMCS"). However, Local 97's primary reason for contacting the FMCS was to obtain strike authorization.[13] Pursuant to a letter dated June 1, 2006, Local 97's membership was notified that the Union Committee had requested FMCS assistance.

---

[11]     From Local 97's perspective, one of the most important issues during negotiations for the new CBA was whether the Security Clause contained in the old CBA would continue.

[12]     There were approximately 83 bargaining unit members that were retirement eligible in 2006.

[13]     Before a strike could occur, Local 97 was required to gain permission from the International Brotherhood of Electrical Workers ("International"), and International will not authorize a strike unless a federal or state mediator has first been utilized by Local 97.

Finally, during the week of June 18, 2006, a tentative agreement regarding the Security Clause was reached.[14]  Later in the week, the parties tentatively agreed on several other terms and conditions, including security guards remaining in the bargaining unit, severance benefits, health care contributions, and retiree medical benefits.[15]  As part of these negotiations, Local 97 had proposed that any agreed upon severance package be offered to individuals, such as Plaintiffs, who had retired on or immediately before May 31, 2006.  However, Constellation would not consider retroactive application and summarily rejected the proposal.

After the new CBA was ratified, sixty-three (63) members, including thirty-four (34) of the remaining forty-seven (47) retirement eligible employees, accepted the agreed upon severance package and left Constellation.  Constellation agreed to continue retiree medical benefits for current employees only.  The retiree medical benefit was eliminated for employees hired after the effective date of the new CBA.

### 5.    Withdrawal of Retirement Grievance

After discussing the Retirement Grievance in detail, the Union Committee recommended that it should be withdrawn because there were no members covered any longer under the grievance.[16]  The Union Committee believed that no remedy was available for retired employees because an arbitrator could not "undo" their voluntary retirement.  In addition, the Committee was not aware of any individuals still employed who were protesting the retirement notification

---

[14]     Local 97 agreed to amend the Security Clause so that, going forward, members with ten or more years of service could be, by seniority, subject to involuntary layoff.

[15]     Although Constellation rejected Local 97's VERP proposal, the parties ultimately agreed on a severance package that, with certain conditions, would be available to any represented employee who voluntarily left employment.

[16]     Individuals that had voluntarily retired, such as Plaintiffs, were not covered.

date.  The Committee did, however, wish to preserve Local 97's right to address the contractual issue in the future.  Accordingly, the Committee recommended to Business Manager David Falletta that the grievance be withdrawn.

Business Manager Falletta proposed to Constellation that the Retirement Grievance be withdrawn.  Constellation agreed and the grievance was withdrawn on June 28, 2006.  The resolution of the pending grievances was made part of the summary of agreement reached between Local 97 and Constellation in late June 2006.  That agreement was presented to the membership who subsequently ratified it in July 2006.  The summary of agreement was then incorporated into the new CBA, effective July 1, 2006.

Familiarity with the remaining undisputed material facts of this action, as set forth in the parties' Rule 7.1 Statements, is assumed in this Decision and Order, which (again) is intended primarily for review by the parties.  (*Id*.)

### C.     Union Defendant's Motion for Summary Judgment

Generally, in support of its motion for summary judgment, Union Defendant argues that Plaintiffs have failed to adduce evidence establishing that Union Defendant breached its duty of fair representation either in processing Plaintiffs' Retirement Grievance, or in negotiating the new CBA.  (*See generally* Dkt. No. 73, Attach. 14 [Union Def.'s Memo. of Law].)

In response, Plaintiffs argue that they have adduced evidence establishing that the Union Defendant breached its duty of fair representation, and therefore their claims against the Union Defendant and the Employer Defendants pursuant to Section 301 of the LMRA should not be dismissed.  (*See generally* Dkt. No. 87, Attach. 3 [Plfs.' Response Memo. of Law].)

In its reply, in addition to reiterating previously advanced arguments, Union Defendant argues as follows: (1) the affidavit of Plaintiffs' attorney should be stricken because it contains legal arguments as well as statements not based on personal knowledge; and (2) Union Defendant did not deceitfully promise Plaintiffs that they could retire and then subsequently rescind their retirement notification.  (*See generally* Dkt. No. 90 [Union Def.'s Reply Memo. of Law].)

### D.   Employer Defendants' Cross-Motion for Summary Judgment

Generally, in support of their cross-motion for summary judgment, Employer Defendants argue as follows: (1) Plaintiffs' common-law misrepresentation and breach-of-duty claims are pre-empted by ERISA, and must therefore be dismissed; (2) Plaintiffs' common-law misrepresentation and breach-of-duty claims are pre-empted by Section 301 of the LMRA, and must therefore be dismissed; (3) Plaintiffs' common-law misrepresentation and breach-of-duty claims are pre-empted by the NLRA, and must therefore be dismissed; (4) Plaintiffs have failed to adduce record evidence establishing their misrepresentation claims; (5) Plaintiffs have failed to allege facts plausibly suggesting a claim for common-law breach of duty; (6) Plaintiffs have failed to adduce record evidence establishing that Union Defendant breached its duty of fair representation, and therefore Plaintiffs' breach-of-duty-of-fair-representation claim against Employer Defendants must be dismissed; (7) even assuming that Plaintiffs have adduced record evidence establishing that Union Defendant breached its duty of fair representation, Plaintiffs' Section 301 claim against Employer Defendants must still be dismissed because Employer Defendants did not breach the old CBA; and (8) Plaintiffs' ERISA claims must be dismissed because (a) Plaintiffs have failed to adduce record evidence establishing a claim for breach of

fiduciary duty based on an alleged misrepresentation, (b) Plaintiffs have failed to adduce record evidence establishing an ERISA "purposeful interference" claim, and (c) Plaintiffs failed to exhaust their administrative remedies provided by their Severance Plan prior to commencing this action.  (*See generally* Dkt. No. 81, Attach. 2 [Employer Defs.' Memo. of Law].)

In response, Plaintiffs argue as follows: (1) Plaintiffs have adduced record evidence establishing that (a) the Union Defendant breached its duty of fair representation, and (b) the Employer Defendants breached the collective bargaining agreement, and therefore Plaintiffs' claims pursuant to Section 301 of the LMRA should not be dismissed; and (2) Plaintiffs have adduced record evidence establishing that Employer Defendants breached their fiduciary duties owed under ERISA.  (*See generally* Dkt. No. 87, Attach. 3 [Plfs.' Response Memo. of Law].)

In their reply, in addition to reiterating previously advanced arguments, Employer Defendants argue as follows: (1) Plaintiffs' common law claims should be dismissed because Plaintiffs failed to respond to Employer Defendants' arguments regarding these claims; (2) Plaintiffs' ERISA claims must be dismissed because Plaintiffs admitted, in their response papers, that (a) they were aware that any changes in the benefits made available to them by Employer Defendants were dependant upon the collective bargaining negotiations, and (b) they were unwilling to take a chance on the result of those negotiations; and (3) the affidavit of Plaintiffs' counsel should be stricken because it contains legal arguments, and is not based on personal knowledge.  (*See generally* Dkt. No. 93 [Employer Defs.' Reply Memo. of Law].)

### E.    Plaintiffs' Cross-Motion for Summary Judgment

Generally, in support of their cross-motion for summary judgment, Plaintiffs argue as follows: (1) Plaintiffs have adduced record evidence establishing that Employer Defendants breached the old CBA, and Employer Defendants have failed to adduce record evidence

15

establishing that they did not breach the old CBA because (a) the old CBA clearly and unambiguously indicates that it was effective through July 1, 2006, and thus was in force through that entire day, and (b) to the extent that the old CBA is not clear and unambiguous, "relevant extrinsic factors demonstrate that the [old] CBA must be interpreted as being in effective through July 1, 2006"; (2) Plaintiffs have adduced record evidence establishing their fraudulent misrepresentation claim, and neither Union Defendant nor Employer Defendants have adduced record evidence establishing that they are not liable under a theory of fraudulent misrepresentation; (3) Plaintiffs have adduced record evidence establishing their negligent misrepresentation claim, and neither Union Defendant nor Employer Defendants have adduced record evidence establishing that they are not liable under a theory of negligent misrepresentation; (4) Plaintiffs have adduced record evidence establishing that the Union breached its duty of fair representation, and Union Defendant has failed to adduce record evidence establishing that it did not breach its duty of fair representation; and (5) Plaintiffs have adduced record evidence establishing that Employer Defendants made a material misrepresentation regarding Plaintiffs' ERISA rights, in breach of the fiduciary duties owed to Plaintiffs, and Employer Defendants have failed to adduce record evidence establishing that they did not breach these duties.  (*See generally* Dkt. No. 80, Attach. 19 [Plfs.' Memo. of Law].)

In response, Union Defendant argues as follows: (1) Plaintiffs have failed to adduce record evidence establishing that Union Defendant breached its duty of fair representation either in processing Plaintiffs' Retirement Grievance, or in negotiating the new CBA; (2) Plaintiffs' breach-of-duty-of-fair-representation claim against Union Defendant must be dismissed because Plaintiffs have failed to adduce evidence establishing that Employer Defendants breached the old CBA; (3) the expiration date of the old CBA is not material to the issue of whether Union

16

Defendant breached its duty of fair representation; and (4) the affidavit of Plaintiffs' counsel should be stricken because it contains legal arguments, and is not based on personal knowledge. (*See generally* Dkt. No. 85, Attach. 2 [Union Def.'s Response Memo. of Law].)

In its response to Plaintiffs' cross-motion for summary judgment, Employer Defendants' argue as follows: (1) Plaintiffs failed to adduce record evidence establishing a breach-of-contract claim, and therefore Plaintiffs' claim pursuant to Section 301 of the LMRA must be dismissed; (2) Plaintiffs failed to adduce record evidence establishing their misrepresentation claims; (3) Plaintiffs failed to adduce record evidence establishing a violation of ERISA; and (4) the affidavit of Plaintiffs' counsel should be stricken because it contains legal arguments, and is not based on personal knowledge.  (*See generally* Dkt. No. 88, Attach. 1 [Employer Defs.' Response Memo. of Law].)

In reply, Plaintiffs argue as follows: (1) they are entitled to summary judgment on their hybrid cause of action brought pursuant to Section 301 of the LMRA because (a) they have adduced record evidence establishing that Union Defendant breached its duty of fair representation, and Union Defendant has failed to adduce record evidence establishing that it did not breach its duty of fair representation, and (b) they have adduced record evidence establishing that Employer Defendants breached the old CBA, and Employer Defendants have failed to adduce record evidence establishing that they did not breach the old CBA; (2) they are entitled to summary judgment on their ERISA claim because, based on the record evidence, no rational factfinder could conclude that Employer Defendants did not breach their fiduciary duties under ERISA; and (3) the affidavit of Plaintiffs' counsel should not be stricken because it does not violate Fed. R. Civ. P. 56(e).  (*See generally* Dkt. No. 92, Attach. 1 [Plfs.' Reply Memo. of Law].)

## II.     RELEVANT LEGAL STANDARDS

### A.     Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that  well-known legal standard in this Decision and Order, but will direct the reader to the Court's recent decision in *Pitts v. Onondaga County Sheriff's Dep't*, 04-CV-0828, 2009 WL 3165551, at *2-3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which accurately recites that legal standard.

### B.     Legal Standards Governing Plaintiffs' Claims

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the legal standards governing Plaintiffs' claims in this action, the Court will not recite, in their entirety, those legal standards in this Decision and Order, which (again) is intended primarily for review by the parties.  (*See* Dkt. No. 73, Attach. 14 [Union Def.'s Memo. of Law]; Dkt. No. 87, Attach. 3 [Plfs.' Response Memo. of Law to Union Def.'s Memo. of Law]; Dkt. No. 90 [Union Def.'s Reply Memo. of Law]; Dkt. No. 81, Attach. 2 [Employer Defs.' Memo. of Law]; Dkt. No. 87, Attach. 3 [Plfs.' Response Memo. of Law to Employer Defs.' Memo. of Law]; Dkt. No. 93 [Employer Defs.' Reply Memo. of Law]; Dkt. No. 80, Attach. 19 [Plfs.' Memo. of Law]; Dkt. No. 85, Attach. 2 [Union Def.'s Response Memo. of Law]; Dkt. No. 88, Attach. 1 [Employer Defs.' Response Memo. of Law]; Dkt. No. 92, Attach. 1 [Plfs.' Reply Memo. of Law].)

**III.    ANALYSIS**

As an initial matter, the Court notes that, in their cross-motion for summary judgment, Employer Defendants assert that only three of the nine "Employer Defendants" are in any way related to Plaintiffs' claims.  (Dkt. No. 81, Attach. 1, at ¶¶ 226-231.)  As a result, Employer Defendants argue that the other six entities comprising the nine "Employer Defendants" should be dismissed from this action.  (Dkt. No. 81, Attach. 2, at 10 n.1.)  In their counter-statement of material facts, Plaintiffs do not deny that these six entities have no relationship to Plaintiffs or other claims.  (Dkt. No. 87, Attach. 2, at ¶¶ 226-231.)  As a result, the Court dismisses the following six entities from this action: (1) Constellation Generation Group, (2) Constellation Energy Commodities Group, Inc., (3) Constellation Energy Corp., (4) Constellation Energy Projects & Services Group, Inc., (5) Constellation Energy Source, Inc., and (6) XYZ Corporation. However, for the sake of clarity, the Court will continue to refer to the remaining three Employer Defendants as the "Employer Defendants."

**A.    Plaintiffs Common Law Claims of Negligent and Fraudulent Misrepresentation, and Breach of Duty**

As stated above in Parts I.D and I.E of this Decision and Order, Employer Defendants and Plaintiffs have cross-moved for summary judgment with regard to Plaintiffs' fraudulent and negligent misrepresentation claims.  In addition, Employer Defendants have cross-moved for summary judgment with regard to Plaintiffs' common-law breach-of-duty claim.  Based on the current record, the Court accepts Employer Defendants' arguments and rejects Plaintiffs arguments.

1.        **Claims of Negligent and Fraudulent Misrepresentation**

a.        **Claims Against Employer Defendants**

Plaintiffs argue that Employer Defendants (1) "misrepresented to the Plaintiffs that[, to preserve benefits afforded under the old CBA,] they had to retire by June 1, 2006[,]" and (2) misrepresented that they would be "eliminating retiree health care and . . . chang[ing] . . . the pension formula [under the new CBA]." (Dkt. No. 80, Attach. 19, at 6-7.)  However, Employer Defendants argue that these claims should be dismissed because, among other things, the misrepresentation claims are pre-empted by ERISA, Section 301 of the LMRA, and the NLRA.

As an initial matter, one of the issues in question (specifically, whether Employer Defendants misrepresented to Plaintiffs that they had to retire by June 1, 2006, to receive benefits afforded under the old CBA) requires the Court to interpret the old CBA to determine the falsity of the alleged statements.  As a result, this claim is preempted by Section 301 of the LMRA.[17]  Moreover, another of the issues in question (specifically, whether Employer Defendants misrepresented that they would be "eliminating retiree health care and . . . chang[ing] . . . the pension formula") relates to Employer Defendants' role as plan administrator under ERISA.  As a result, this claim is preempted by ERISA.[18]

---

[17]        *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 261 (1994) ("[W]here the resolution of a state-law claim depends on an interpretation of the collective-bargaining agreement, the claim is pre-empted [by Section 301].")

[18]        *Smith v. Dunham-Bush, Inc.*, 959 F.2d 6, 10 (2d Cir. 1992) (concluding that plaintiff's breach of contract and negligent misrepresentation claims were preempted where plaintiff was an ERISA plan participant, the Complaint explicitly referenced the plan, the oral representation underlying the suit dealt "exclusively" with plaintiff's benefits, and the desired relief would implicate defendant's administration of the plan"); *Zydel v. Dresser Indus., Inc.*, 798 F. Supp. 975, 977 (W.D.N.Y. 1991) (upholding dismissal of plaintiffs misrepresentation claims based on their allegation "that they were promised an opportunity to return to their union

**b.      Claims Against Union Defendant**

Plaintiffs argue that Union Defendant (1) "misrepresented to the Plaintiffs that they

would advocate on their behalf and have the retirement date issue resolved prior to May 31,

2006[,]" and (2) "misrepresented the status of the grievance process and led [P]laintiffs to

believe they could [b]e included retroactively in the severance offered in the new contract."

(Dkt. No. 80, Attach. 19, at 7.)  Such arguments relate to Union Defendant's duty of fair

representation.  As a result, these claims are preempted by the NLRA.  *Sheehan v. U.S. Postal*

*Serv.*, 6 F. Supp.2d 141, 151 (N.D.N.Y. 1997) (Kahn, J.) ("[W]here a union intentionally

misrepresents the status of a grievance, it commits a breach of its duty of fair representation. . . .

The misrepresentation claim in this case thus creates no new rights, and is subsumed by the duty

of fair representation. Therefore, plaintiff's misrepresentation claim is preempted by federal labor

law[.]").[19]

---

positions without loss of union benefits if their management positions were ever abolished or if
they retired," finding that this sort of claim is preempted by ERISA); *Lee v. E.I. Dupont de
Nemours & Co.*, 894 F.2d 755, 757 (5th Cir. 1990) (preempting claim of "plaintiffs [who] seek
to recover benefits defined by their former employer's ERISA plan, benefits to which they would
have become entitled but for a misrepresentation by their employer, during their employment, on
which they relied to their detriment."); *Pane v. RCA Corp.*, 667 F. Supp. 168, 172 (D. N.J.
1987), *aff'd*, 868 F.2d 631 (3d Cir. 1989) (finding alleged breach of promise to include plaintiff
in severance plan preempted by ERISA).

[19]      *See also Morris v. Local 819, IBT*, 94-CV-8010, 1995 WL 293623, at *3
(S.D.N.Y. May 11, 1995) (concluding that plaintiff's claim against Union for promising to take a
grievance to arbitration and then failing to do so was preempted because duty was already
"encompass[ed]" by the duty of fair representation); *Faiola v. Youngstown Steel Door Co.*,
85-CV-2562, 1992 WL 135567, at *4 (N.D. Ohio Apr. 16, 1992) (finding that claim that
plaintiffs were falsely told that grievance would be pursued was preempted by DFR).

### 2.      Claims of Breach of Duty

Plaintiffs's third cause of action asserts a claim for "breach of duty" based on "Defendants, their agents, servants and/or employees' [failure to comply with their] duty to exercise reasonable care and competence in communicating benefit information to Plaintiffs for which Defendants knew or should have known that Plaintiffs would detrimentally rely." (Dkt. No. 16, at 19, ¶ 70.)  As an initial matter, because this claim relates to Employer Defendants' duties under the CBA and/or as a plan administrator, and Union Defendant's duties of representation, the claim is preempted by Section 301 of the LMRA, ERISA, and/or the NLRA. Moreover, as noted by Employer Defendants in their memorandum of law in support of their cross-motion for summary judgment, under New York law, "[t]here is no authority for the proposition that the employer has a duty to inform the employee with respect to the effect of terms of a collective bargaining agreement reached as a result of negotiations between the employer and the employee's collective bargaining representative." *Brauch v. Interstate Brands Corp.*, 79 A.D.2d 1104, 1104 (N.Y. App. Div., 4 Dept. 1981); *cf. Van Ostrand v. Nat'l Life Assur. Co. of Canada*, 82 Misc.2d 829, 834-35 (N.Y. Sup. Ct. 1975) (holding that employer did not breach its general administrative duty by failing to inform employees about the terms and conditions of a group life insurance plan).

For all these reasons, the Court dismisses Plaintiffs' common law claims of negligent and fraudulent misrepresentation, and breach of duty.

### B.      Plaintiffs' Two Claims Under Section 301 of LMRA

Plaintiffs assert two claims under Section 301 of the LMRA, which under the circumstances are known as "hybrid" claims: (1) a breach of the duty of fair representation; and

(2) a breach of the parties' CBA.[20]  "The suit against the employer rests on [S]ection 301, since the employee is alleging a breach of the collective bargaining agreement." *DelCostello*, 462 U.S. at 164.  "The suit against the union is one for breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act." *Id*.  "Yet the two claims are inextricably interdependent." *Id*. (citation omitted).  "To prevail against either the company or the Union, employee-plaintiffs must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating a breach of duty by the Union." *Id*. at 165 (citations and internal quotations omitted).  Stated another way, to be successful against either the Employer or the Union, an employee-plaintiff must establish breach of the Union's duty of fair representation.  *See Beckman v. U.S. Postal Serv.*, 79 F. Supp.2d 394, 405 (S.D.N.Y. 2000) (citations omitted).

### 1.    Claim of Breach of Duty of Fair Representation

"A union has broad discretion in its decision whether and how to pursue an employee's grievance against an employer." *Beckman*, 79 F. Supp.2d at 401 (citing *Chauffeurs Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 567-68 [1990]) (other citations omitted). Although this discretion is not unlimited, *see Vaca v. Sipes*, 386 U.S. 171, 184-86 (1967), it remains broad because "union discretion is essential to the proper functioning of the collective-bargaining system." *Int'l Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 51 (1979) (noting also that "Union supervision of employee complaints promotes settlements, avoids processing of frivolous claims, and strengthens the employer's confidence in the union," all of which is imperative to avoiding "the costs of private dispute resolution").

---

[20]    A claim by a union employee against an employer based on breach of a collective bargaining agreement, and the Union for breaching its duty of fair representation, is considered a "hybrid" Section 301 claim under the Labor Management Relations Act.  *See DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 163-64 (1983).

"Based on this rationale, the duty of fair representation merely obliges a union to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Beckman*, 79 F. Supp.2d at 401 (citing *Regan v. Soft Drink & Brewery Workers Union*, No. 95-7420, 1995 WL 722862, at *1 [2d Cir. Nov. 14, 1995]) (other citations omitted). "It is the plaintiff's burden to prove the union breached its duty, not the employer's to show that it did not." *Id.* (citation and internal quotations omitted). Consequently, to prevail on a claim of breach of the duty of fair representation, the plaintiff must establish two elements: (1) the Union's conduct was "arbitrary, discriminatory, or in bad faith"; and (2) "the Union's acts or omissions seriously undermined the arbitral process." *Id.* (citations omitted).

"A union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Sanozky v. Int'l Ass'n of Machinists and Aerospace Workers*, 415 F.3d 279, 282-83 (2d Cir. 2005) (citing *Airline Pilots Ass'n Int'l v. O'Neill*, 499 U.S. 65, 67 [1991]). In addition, "the Second Circuit has held that the second element requires a plaintiff to prove that there was a causal connection between the union's wrongful conduct and [her] injuries." *Vargas v. Hill*, 152 F. Supp.2d 315, 320 n.6 (S.D.N.Y. 2001) (citation and internal quotations omitted). Moreover, "[n]egligence or 'tactical errors' on the part of the union are insufficient to establish a breach of the duty of fair representation. *White v. White Rose Food*, 62 F. Supp.2d 878, 884 (E.D.N.Y. 1999) (citation omitted).

Here, Union Defendant and Plaintiffs have moved for summary judgment with regard to Plaintiffs' breach-of-duty-of-fair-representation claim (arising out of two distinct actions or

24

inactions). Based on the current record, the Court accepts Union Defendant's argument and rejects Plaintiffs' argument. The Court will address both of Plaintiffs' particular fair-representation claims in turn.

### a.   Union's Processing of Plaintiffs' Retirement Grievance

First, Plaintiffs claim that the Union's wrongful withdrawal of Plaintiffs' Retirement Grievance constitutes a breach of the duty of fair representation. Plaintiffs further claim that the Union failed to inform Plaintiffs that the Retirement Grievance had been denied on May 16, 2006, because of its discriminatory animus toward Plaintiffs.

With regard to Plaintiffs claim that the Union's wrongful withdrawal of Plaintiffs' Retirement Grievance constitutes a breach of the duty of fair representation, it is well settled that "the duty of fair representation is not breached where the union fails to process a meritless grievance, engages in mere negligent conduct, or fails to process a grievance due to error in evaluating the merits of the grievance." *Cruz v. Local Union No. 3, Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1153-54 (2d Cir. 1994).[21] Rather, to establish a breach of the duty of fair representation based on a decision to withdraw a grievance, a plaintiff must "set forth concrete,

---

[21]    *See also White v. White Rose Food, a Div. of DiGiorgio Corp.*, 62 F. Supp.2d 878, 884 (E.D.N.Y. 1999) ("It is well established that while a union may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion, an employee does not have an absolute right to have his or her grievance taken to arbitration. . . . "[A]s long as the union acts in good faith, the courts cannot intercede on behalf of employees who may be prejudiced by rationally founded decisions which operate to their particular disadvantage."); *Spellacy v. Airline Pilots Ass'n-Int'l*, 156 F.3d 120, 130 (2d Cir. 1998); *Ayala v. Union de Tronquistas de Puerto Rico, Local 901*, 74 F.3d 344, 345-46 (1st Cir. 1996) ("[T]he duty of fair representation is not a straitjacket which forces unions to pursue grievance remedies under the collective bargaining agreement in every case where an employee has a complaint against the company. . . ."); *Reed v. Int'l Union of UAW*, 945 F.2d 198, 203 (7th Cir. 1991) (holding that the union is not compelled to prosecute a grievance that it honestly believes lacks merit).

specific facts from which one can infer a union's hostility, discrimination, bad faith, or arbitrary exercise of discretion." *Spielmann v. Anchor Motor Freight, Inc*., 551 F. Supp. 817, 822 (S.D.N.Y. 1982).

Here, Plaintiffs do not dispute that the Union did not withdraw Plaintiffs' Retirement Grievance until after Plaintiffs all retired,[22] nor do they deny that the Union's withdrawal of the Retirement Grievance was based on the following: (1) the fact that individuals who had voluntarily retired, such as Plaintiffs, were no longer covered under the grievance; (2) the Union's belief that no remedy was available to retired employees such as Plaintiffs because an arbitrator could not "undo" their voluntary retirement; and (3) the fact that the Union was not aware of any employees then-employed who were protesting the retirement notification date. In other words, Plaintiffs do not dispute that Union Defendant had a good faith justification for not pursuing the grievance. Accordingly, the Court finds that Plaintiffs have failed to introduce record evidence establishing that Union Defendant's decision to withdraw Plaintiffs' Retirement Grievance constituted a breach of its duty of fair representation.

Furthermore, with regard to Plaintiffs' claim that the Union failed to inform them that the Retirement Grievance had been denied on May 16, 2006, because of its discriminatory animus toward Plaintiffs, "[t]he failure to keep a grievant informed of the status of the grievance is not a breach of the duty of fair representation." *Lettis v. USPS*, 39 F. Supp.2d 181, 197 (E.D.N.Y. 1998) (citing *Caputo v. Nat'l Ass'n of Letter Carriers*, 730 F. Supp. 1221, 1230 [E.D.N.Y. 1990]).[23] Rather, Plaintiff must also establish that the Union's failure to keep them informed of

---

[22]     (*Compare* Dkt. No. 73, Attach. 1, at ¶ 91, *with* Dkt. No. 87, Attach. 1, at ¶ 91.)

[23]     *See also Tracy v. Local 255, Int'l Union of Electronic, Elec., Tech., Salaried & Mach. Workers*, 783 F. Supp. 1527, 1531 (D. Mass. 1992) ("[F]ailure of the union to provide information on the status of a grievance is not indicative of arbitrary behavior in the processing of the grievance itself. . . . Lack of communication, without more, is insufficient to evidence arbitrary or capricious processing of a claim.").

the status of their grievance caused them to suffer prejudice.[24]

Here, Plaintiffs argue that they were prejudiced by the Union's failure to inform them that their Retirement Grievance had been denied at a Step One of the grievance process because, had they known that the grievance was denied, they would have been able to make a more informed decision regarding their decision to retire.  The Court rejects this argument for three reasons.

First, Plaintiffs have failed to adduce record evidence (in the form of affidavits or exhibits) establishing that, had they known that the grievance was denied, they would have acted differently.

Second, Plaintiffs do not deny that (1) they were aware that the Union and Employer Defendants have a multi-step process for resolving disputes, and (2) after the Retirement Grievance was denied at Step One, the grievance did not proceed to a formal Step Two, but instead remained open and was immediately pursued by the Union through negotiations the day after the denial.  Based on these facts, informing Plaintiffs about the Step One denial would not have helped them make an informed decision because a Step One denial is only the beginning of the grievance process, and the grievance was still being actively pursued after the denial.

Third, and more importantly, Plaintiffs' argument implies that knowledge of the Step One denial may have caused them to decide not to retire.  However, if anything, knowledge of the denial would have provided an increased incentive to retire.

---

[24]        *See Yakowec v. Niagara Mohawk Power Corp.*, 92-CV-1130, 1993 WL 226435, at *17 (N.D.N.Y. June 24, 1993) (McCurn, J.) (rejecting plaintiff's argument that the Union breached its duty of fair representation by failing to make him aware of the settlement and eventual withdrawal of his grievances until well after the fact because, "[e]ven accepting as true . . . this version of events, . . . there is no showing that plaintiff was prejudiced in any way by the Union's conduct"); *Bazarte v. United Transp. Union*, 429 F.2d 868, 872 (3d Cir.1970) (finding that a union's failure to inform the plaintiff of its decision not to go forward with his case was insufficient to establish unfair representation where there was no showing of prejudice).

Accordingly, the Court finds that Plaintiffs have failed to adduce record evidence

establishing that they suffered prejudice as a result of the Union not informing them that their

Retirement Grievance was denied at the Step One hearing (and therefore they have failed to

adduce record evidence establishing that Union Defendant breached its duty of fair

representation by failing to inform them that the Retirement Grievance had been denied on May

16, 2006).

For these reasons, Union Defendant's motion for summary judgment on this ground is

granted, Plaintiffs' cross-motion for summary judgment on this ground is denied, and Plaintiffs'

claim that Union Defendant breached its duty of fair representation in the manner in which it

processed Plaintiffs' Retirement Grievance is dismissed.

### b.      Union's Negotiation of New CBA

Second, Plaintiffs claim that the Union's failure to keep them apprised of ongoing

negotiations, as well as the Union's act of deceitfully promising Plaintiffs that they could retire

and then subsequently rescind their retirement notification, amount to a breach of the Union's

duty of fair representation.

With regard to Plaintiffs claim that the Union's failure to keep them apprised of ongoing

negotiations constitutes a breach of the Union's duty of fair representation, it is undisputed that

Union and Employers Defendants entered into a confidentiality agreement at the start of

bargaining.  (*Compare* Dkt. No. 73, Attach. 1, at ¶ 44, *with* Dkt. No. 87, Attach. 1, at ¶ 44.)  As a

result, very little, if any, substantive information could be provided to Union members regarding

negotiations.  (*Id.*)  Moreover, even assuming that Union Defendant could provide Plaintiffs with

information pertaining to the retirement notification date, absent some showing that they would

otherwise suffer prejudice, the Union does not have a duty to keep its members apprised of

ongoing negotiations.[25]

Here, the only prejudice Plaintiffs even remotely suggest is that, as a result of being uninformed about the status of ongoing negotiations related to the effective date on which retirement must be taken in order to ensure retirement benefits under the old CBA, they were unable to make an informed decision regarding retirement.[26]  However, for the same reasons that the Court rejected the argument that the Union had a duty to inform Plaintiffs that the Retirement Grievance had been denied (i.e., that negotiations regarding the grievance were ongoing, and notice of the Step One denial would only have supported any decision to retire), the Court rejects this argument.

In addition, with regard to Plaintiffs argument that the Union breached its duty of fair representation by deceitfully promising Plaintiffs that they could retire and then subsequently rescind their retirement notification, the Court rejects this argument for two reasons.   First, there is no evidence in the record establishing that the Union promised Plaintiffs that they could retire and then subsequently rescind their retirement notification.  Instead, there is only the following: (1) Plaintiffs' attorney's allegation, in an attorney affidavit, that Union Defendant "represented to the plaintiffs that they could rescind their notification [after they retired,] and that they would continue to advocate for them[, despite knowing that once Plaintiffs retired, they were not entitled to representation;]" and (2) Plaintiffs' argument in their response memorandum of law

---

[25]     *See DeHart v. United Steelworkers of Am.*, 79-CV-0325, 1982 WL 2168, at *4 (N.D.N.Y. Mar. 29, 1982) (Foley, J.) ("Plaintiffs additionally claim that the Union intentionally failed to keep them informed of the negotiations thereby breaching its duty of fair representation. However, even if the Union had failed to inform the plaintiffs or misrepresented to them the status of the negotiations as the plaintiffs claim, these actions would not rise to a breach of the duty of fair representation for the plaintiffs have failed to show any causal link between such dereliction, if it occurred, with resulting harm to plaintiffs.").

[26]     The Court notes that there is no evidence in the record establishing that, prior to May 31, 2006, Union Defendant was aware that, under the new CBA being negotiated, retiree medical benefits would be continued and a severance benefit would be offered.

that the Union made this promise.  (Dkt. No. 87, Attach. 3, at 19 [Plfs.' Response Memo. of Law]; Dkt. No. 87, at 7, ¶ 15 [Affid.].)[27]

Second, even assuming that the statement in the email to Plaintiff Robert could somehow be construed as implicitly indicating that she could retire and then subsequently "un-retire" if the new CBA afforded her more favorable benefits than the old CBA that she retired under, Plaintiffs have failed to introduce any evidence, let alone *substantial evidence*, establishing that the statement in the email was made in an effort to deceive Plaintiff Robert into retiring.  *See Capobianco v. Brink's Inc.*, 543 F. Supp. 971, 975 (E.D.N.Y. 1982) (noting that, "[t]o succeed under § 301, an employee must show *substantial evidence* of fraud, deceitful action or dishonest conduct, hostile discrimination, arbitrariness or irrationality, or conduct in bad faith") (emphasis added); *Mangrum v. US West Commc'ns, Inc.*, 961 F. Supp. 1510, 1516 (D. Utah 1996) (finding that Union did not act in bad faith in giving advice to members, for purposes of claim that Union

---

[27]     The Court notes that the attorney affidavit in question does not provide a record citation in support of this statement, nor does it demonstrate that the attorney has personal knowledge of the facts asserted.  The Court notes further that, in their response memorandum of law, Plaintiffs cite to Exhibit EE, which is an email dated May 22, 2006, from the Union's Vice President to Plaintiff Cindy Robert.  (Dkt. No. 79, Attach. 36.)  In that email, Union's Vice President responds to Robert's inquiry regarding where things stand "on the issue of the retirement dates" as follows: "We have had discussion on the retirement date matter and will continue it tomorrow. I will communicate ASAP one way or another, but you can still notify them on the 5/31/06 date and either change it if they change their position to 6/30/06 or rescind it to later in the year." (Dkt. No. 79, Attach. 36.)  As Union Defendant argues in its reply memorandum of law, this email discusses notification.  More specifically, the email states that Plaintiff Robert, who was still employed at the time of the email, could notify Employer Defendants of her plan to retire on May 31, 2006, and either (1) change the retirement date if Employer Defendants changed their position regarding the applicable retirement notification date, or (2) rescind her notice of her intent to retire to later in the year.  The email does not contain an assurance, either express or implied, that Plaintiff Robert could retire and then subsequently "un-retire" and return to employment.  In fact, consistent with the statement in the email is the testimony of Plaintiff Borden, who testified that, because an employee had to retire at the end of the month, he or she could provide notice of intent to retire (at the end of the month) and rescind this notification, as long as the rescission occurred before midnight on the last day of the month.  (Dkt. No. 81, Attach. 19, at 65 [Borden Dep. Tr.].)

violated its duty of fair representation, because even if advice was poor or negligent, there was

no evidence union defrauded, deceived, or lied to members).[28]

For these reasons, Union Defendant's motion for summary judgment on this ground is

granted, Plaintiffs' cross-motion for summary judgment on this ground is denied, and Plaintiffs'

claim that the Union breached its duty of fair representation by failing to keep Plaintiffs apprised

of ongoing negotiations and deceitfully promising Plaintiffs that they could retire and then

subsequently rescind their retirement notification is dismissed.

### 2.      Claim of Breach of Collective Bargaining Agreement

Turning to Plaintiffs' claim that the Employer Defendants breached the old CBA, it

should be noted that, "as a Union employee, the Union was Plaintiffs' exclusive bargaining

agent." *Duttweiler v. Eagle Janitorial, Inc*., 05-CV-0886, 2009 WL 1606351, at *17 (N.D.N.Y.

June 4, 2009) (Suddaby, J.) (citations omitted).  When "the Union was plaintiff's exclusive

bargaining agent, plaintiff must prove that the Union breached its duty of fair representation

before the Court can even consider its allegations against the [employer]."  *Beckman*, 79 F.

Supp.2d at 405.  "Thus, plaintiff's case against the [employer] cannot succeed, as a matter of law,

in the absence of an essential element of their claim, namely, that the Union breached its duty of

fair representation."  *Beckman*, 79 F. Supp.2d at 405.  As a result, Employer Defendants' cross-

motion for summary judgment on this ground is granted, Plaintiffs' cross-motion for summary

judgment on this ground is denied, and Plaintiffs' claim that Employer Defendants breached the

old CBA is dismissed.

---

[28]      *See also Buford v. Runyon*, 160 F.3d 1199, 1202 (8th Cir. 1998) ("Mere
negligence, poor judgment, or ineptitude by a union is insufficient to establish a breach of the
duty of fair representation.").

C.      **Plaintiffs' ERISA Claim**

Employer Defendants and Plaintiffs have cross-moved for summary judgment with regard to this claim.  As stated above in Part I.D. of this Decision and Order, Employer Defendants seek the dismissal of this claim because (1) Plaintiffs have failed to adduce record evidence establishing a claim for breach of fiduciary duty based on an alleged misrepresentation, (2) Plaintiffs have failed to adduce record evidence establishing an ERISA "purposeful interference" claim, and (3) Plaintiffs failed to exhaust their administrative remedies provided by their Severance Plan prior to commencing this action.  Conversely, as stated above in Part I.E. of this Decision and Order, Plaintiffs request summary judgment based on their argument that they have adduced record evidence establishing that Employer Defendants made a material misrepresentation regarding their ERISA rights, in breach of the fiduciary duties owed to Plaintiffs, and Employer Defendants have failed to adduce record evidence establishing that they did not breach these duties.

As an initial matter, the Court notes that Plaintiffs failed to address Employer Defendants' second and third arguments in their response memorandum of law.  As a result, Employer Defendants' burden is lightened with regard to these arguments such that, in order to succeed on these arguments, Employer Defendants need show only that their requests have facial merit.  *Rusyniak v. Gensini*, 07-CV-0279, 2009 WL 3672105, at *1 n.1 (N.D.N.Y. Oct. 30, 2009) (Suddaby, J.) (citing cases that stand for the proposition that, where plaintiffs do not respond to defendants' argument made in their summary judgment motion, plaintiffs are deemed to have consented to defendants' argument, and thus defendants must only satisfy their "modest threshold burden" of demonstrating entitlement to the relief requested in their motion for summary judgment).

Based on their motion papers, the Court finds that Employer Defendants have met this lightened burden with regard to their second argument.  In any event, the Court finds that Employer Defendants' second argument would survive the heightened scrutiny appropriate on a contested motion for the reasons stated in Employer Defendants' memorandum of law.  (Dkt. No. 81, Attachment 2, at 55-57.)  As a result, to the extent that Plaintiff has asserted an ERISA "purposeful interference" claim, that claim is dismissed.  In addition, turning to Employer Defendants' first argument, based on the current record, the Court accepts this argument and rejects Plaintiffs' argument for the reasons stated below.[29]

### 1.    Claim for Breach of Fiduciary Duty Based on Alleged Misrepresentation

Plaintiffs argue that Employer Defendants "made a number of misrepresentations during the time leading up to the Plaintiffs' retirement[,]" (Dkt. No. 87, Attach. 3, at 21), which "caused [them] to make an uninformed decision to retire under the [old CBA,] instead of making an informed decision about when to retire."  (Dkt. No. 80, Attach. 19, at 20-21.)  More specifically, Plaintiffs argue as follows: (1) "at town hall meetings in 2006, Tim O'Connor, Vice President of the Nine Mile site, represented that Constellation was planning staff reductions and suggested that anyone close to retirement status either retire, or risk losing possible medical benefits under the new [CBA]"; (2) "Mr. O'Connor also stated that there would be no severance packages for anyone in 2006"; and (3) "Ms. Peters of Human Resources made the same statements."[30]  (*Id.* at 21-22.)

---

[29]    Having accepted Employer Defendants' first and second arguments, which address the entirety of Plaintiffs' ERISA claims, the Court need not, and does not, consider Employer Defendants' third argument, i.e., that Plaintiffs failed to exhaust their administrative remedies provided by their Severance Plan prior to commencing this action.

[30]    The Court notes that the record evidence that Plaintiffs cite in support of this third argument establishes that the statement was made by Julie Cox, not Yvette Peters.  (Dkt. No. 80, Attach. 13, at 4, ¶ 12.)

"To obtain relief under [Section 502 of ERISA] for breach of a fiduciary duty based on a misrepresentation,[31] a plaintiff must demonstrate '(1) that the defendants were acting in their fiduciary capacities when they made the alleged misrepresentations[,] (2) that the defendants made a material misrepresentation[,] and (3) that the plaintiff relied on that misrepresentation to his detriment.'" *Adams v. Niagara Mohawk Power Corp.*, 02-CV-1353, 2008 WL 4527694, at *2 (N.D.N.Y. Sept. 30, 2008) (Scullin, J.) (quoting *McDonald v. Pension Plan of NYSA-ILA Pension Trust Fund*, 153 F. Supp.2d 268, 296 [S.D.N.Y. 2001], *rev'd in part on other grounds*, 320 F.3d 151 [2d Cir. 2003] [citations omitted]).

Before analyzing these elements, however, "a preliminary issue [exists] concerning whether . . . [the above-three] statements were misrepresentations at all." *Adams*, 2008 WL 4527694, at *2 n.4.  Ordinarily, "[t]his is an issue for the trier of fact." *Id.* (citing *Mullins v. Pfizer, Inc.*, 23 F.3d 663, 669 [2d Cir. 1994] [citation omitted]).  However, a question of fact cannot exist where a rational factfinder could reach only one conclusion.

Here, with regard to Tim O'Connor's statement that Constellation was planning staff reductions, it is undisputed that Constellation planned a reduction in force for September 14, 2006.  As a result, this statement, by itself, cannot even be presumed to be a misrepresentation.

---

[31]      Section 502 of ERISA provides, in pertinent part, as follows:

A civil action may be brought–

*  *  *

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

29 U.S.C. § 1132(a)(3).

However, when taken in context, the entirety of Mr. O'Connor's alleged statement can plausibly be interpreted as follows: because "Constellation [is] planning staff reductions[,] . . . anyone close to retirement status [should] either retire, or risk losing possible medical benefits under the new [CBA]."  When viewed in this light, the implicit suggestion is that retirement medical benefits would be eliminated under the new CBA.  Based on this plausible interpretation of the alleged statement, "[t]he Court will assume, for purposes of this motion, that [each of the] alleged statements were misrepresentations."  *Adams*, 2008 WL 4527694, at *2 n.4.

> a. **Whether Tim O'Connor and Julie Fox Were Acting in a Fiduciary Capacity When They Made the Alleged Misrepresentations**

"Under ERISA, a fiduciary is defined functionally: a party is a fiduciary 'to the extent that he or she exercises discretion over the management of the plan or its funds or over its administration."  *Livick v. The Gillette Co.*, 524 F.3d 24, 29 (1st Cir. 2008) (citing, *inter alia*, 29 U.S.C. § 1002[21][A]).  "A fiduciary named in an ERISA plan can undertake non-fiduciary duties, and a party not identified as a plan fiduciary can become one if, but only to the extent that, he or she undertakes discretionary tasks related to the plan's management or administration."  *Livick*, 524 F.3d at 29 (citations omitted).  "Thus in cases alleging breach of ERISA fiduciary duty, 'the threshold question is not whether the actions of some person employed to provide services under a plan adversely affected a plan beneficiary's interest, . . . but whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint."  *Id*. (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 [2000]).

"[T]he '[c]alculation of benefits' and '[p]reparation of reports concerning participants' benefits' are 'ministerial functions,' and 'a person who performs purely ministerial functions  . . .

within a framework of policies, interpretations, rules, practices and procedures made by other persons is not a fiduciary.'" *Id.* (quoting 29 C.F.R. § 2509.75-8[D-2]); *see also, e.g., Schmidt v. Sheet Metal Workers' Nat'l Pension Fund*, 128 F.3d 541, 544 n.1, 547 (7th Cir. 1997) (listing tasks-including "determining benefit amounts due under the plan, and responding to participants' inquiries about pension benefits"-assigned to benefit analyst found to be a non-fiduciary).[32]

### i.   Julie Cox

According to Plaintiff Fay Kimball, "[o]n May 27, 2006[, she] went to [the Human Resources Department] and contacted Yvette Peters." (Dkt. No. 80, Attach. 13, at 4, ¶ 12.) "While in conversation with Ms. Peters, Julie Cox said she had time to answer questions." (*Id.*) Kimball "asked about the retirement date and [Cox] said it was June 1, 2006, last working day is May 31, 2006." (*Id.*) "When asked about the June 30, 2006 date, as in past practice any employee wishing to retire had up to the last day of the month, Julie Cox said 'no,' and told [Kimball] Local 97 had filed a grievance." (*Id.*) "[Cox] then informed [Kimball] that the company would be taking benefits away and if [Kimball] wanted to keep them[, she] had to get out." (*Id.*) "[Cox] told [Kimball] that if she was in [her] place she would get out." (*Id.*) "Then she informed [Kimball] that there was no severance package coming." (*Id.*)

---

[32]    *See also Cerasoli v. Xomed, Inc.*, 47 F. Supp.2d 401, 410-11 (W.D.N.Y. 1999) ("The brief statements about Cerasoli's benefits were not made at a meeting held expressly and solely to discuss plaintiff's benefits; they were not intended to persuade plaintiff to take any particular action, such as switching to a different plan; they were not made for Xomed's own financial benefit; and based on plaintiff's own allegations, they were not intentionally misleading, but at most simply mistaken. Based upon the context in which they were made, these statements related more to plaintiff's employment in general than to his particular rights under the plan, and they cannot be said to have been made in connection with Xomed's administration or management of the plan."); *but see Taylor v. Peoples Natural Gas Co.*, 49 F.3d 982, 985-89 (3d Cir. 1995) (finding that statements by Supervisor of Employee Benefits, who was not a member of the Annuities and Benefits Committee, that, "should an early retirement program be offered, it might apply retroactively," could be imputed to plan administrator because statements concerned security of future benefits and declarant was authorized "to advise employees of their rights and options under the Pension Plan").

As an initial matter, Plaintiffs have failed to adduce record evidence establishing that Julie Cox was a fiduciary named in an ERISA plan.  Rather, the record reflects that Ms. Cox was a Human Resources Representative.  (*Compare* Dkt. No. 81, Attach. 1, at ¶ 84, *with* Dkt. No. 87, Attach. 2, at ¶ 84.)  Moreover, the statements made by Ms. Cox were not made at a meeting, and were not specific to Plaintiff Kimball's retirement benefits, but were instead made in response to inquiries made by Kimball concerning the retirement notification deadline (i.e., employment concerns).  In sum, based upon the context in which these statements were made, the Court finds that they related more to Plaintiff Kimball's employment in general than to her particular rights under the plan, and they cannot be said to have been made in connection with Employer Defendants' administration or management of the plan.

For these reasons, the Court dismisses Plaintiffs' breach-of-fiduciary-duty claim arising out of an alleged misrepresentation made by Julie Cox.

### ii.    Tim O'Connor

For the sake of brevity, the Court will only note that, because Mr. O'Connor's statements were made at a meeting, and because the record is sparse regarding the nature, duration, format, and dialogue of the meeting, the Court assumes, for purposes of deciding Employer Defendants' cross-motion and Plaintiffs' cross-motion, that Tim O'Connor, Constellation's Site Vice President, was acting in his fiduciary capacities when he made the alleged misrepresentations. Having done so, the Court must consider whether Employer Defendants' alleged misrepresentations were material.

### b.    Whether Employer Defendants' Alleged Misrepresentations Were Material

"When determining the materiality of an employer's alleged misrepresentation, the court must consider (1) whether the employer seriously considered implementing plan changes at the time the statement was made, (2) how significantly the statement misrepresented internal

discussions about plan changes, (3) whether there was a special relationship of trust between the fiduciary and the plan participant, (4) whether there existed information or circumstances that would have lessened the importance of the statement to a reasonable employee, and (5) the statement's specificity." *Adams*, 2008 WL 4527694, at *2 (citing *Ballone v. Eastman Kodak Co.*, 109 F.3d 117, 124-25 [2d Cir. 1997]).  "The object of this analysis is to determine whether the misrepresentations 'would induce a reasonable person to rely upon them,' . . . which is 'a mixed question of law and fact.'"  *Id.* (quoting *Mullins*, 23 F.3d at 669 [quotation omitted]).

> **i.    Whether Employer Defendants Seriously Considered Maintaining Retirement Medical Benefits and/or Offering Severance Packages Under the New CBA**

Plaintiffs argue that Employer Defendants "seriously consider[ed] saving costs by making job eliminations as a result of its staffing study, and a reduction in work force was planned in September 2006."  (Dkt. No. 87, Attach. 3, at 25.)  Plaintiffs further argue that the Town Hall meetings were held to discuss the job eliminations, which renders their situation as different from that of the plaintiffs in *Radley v. Eastman Kodak Co.*, 19 F. Supp.2d 89 (W.D.N.Y. 1998).  However, whether Employer Defendants "seriously consider[ed] saving costs by making job eliminations as a result of its staffing study" is not the relevant inquiry.  Rather, the issue of the materiality of the misrepresentation must focus on whether, at the time the alleged misrepresentation was made, Employer Defendants were seriously considering the exact opposite of what was represented.  In other words, when Tim O'Connor made statements at the Town Hall Meeting on May 3, 2006,[33] suggesting that retirement medical benefits and severance packages would be eliminated under the new CBA, the relevant inquiry is whether Employer

---

[33]    (Dkt. No. 81, Attach. 7, at 5, 7 [indicating date of Town Hall Meeting as May 3, 2006, and presenter of "Business Plan Performance" as Tim O'Connor].)

Defendants were in actuality seriously considering maintaining retirement benefits and/or severance packages under the new CBA.

With this in mind, as noted in *Adams*, "[s]erious consideration does not occur until '(1) a specific proposal (2) is being discussed for purposes of implementation (3) by senior management with the authority to implement the change.'" *Adams*, 2008 WL 4527694, at *3 (quoting *Fischer v. Philadelphia Elec. Co.*, 96 F .3d 1533, 1539 [3d Cir. 1996]). "This test was designed to 'distinguish[ ] serious consideration from the antecedent steps of gathering information, developing strategies, and analyzing options.'" *Id.* (quoting *Fischer*, 96 F .3d at 1539-40).

Here, Plaintiffs have offered no evidence that Employer Defendants had discussed any specific proposals concerning severance packages and/or the continuance of retirement medical benefits under the new CBA as of May 3, 2006 (the date these alleged misrepresentations were made).[34]  Moreover, as Employer Defendants note in their memorandum of law, prior to commencing negotiations on the new CBA, "Constellation could not seriously consider implementing a new severance program . . . because th[is] [was an] issue[] subject to mandatory collective bargaining with Local 97." (Dkt. No. 81, Attach. 2, at 47.)  In addition, "at the onset of the negotiations, Constellation actually proposed changing retiree benefits, including eliminating retiree medical benefits and changing the formula by which benefits under the Pension Plan were calculated."  (*Id.*)

---

[34]     Similarly, to the extent that Julie Cox could somehow be deemed to be a fiduciary, Plaintiffs have offered no evidence that Employer Defendants had discussed any specific proposals concerning severance packages and/or the continuance of retirement medical benefits under the new CBA as of May 27, 2006.  To the contrary, the record evidence establishes that, on May 16, 2006, less than two weeks prior, Employer Defendants submitted a proposal to Union Defendant which sought to eliminate retiree medical benefits.

For these reasons, the Court finds that Plaintiffs have failed to adduce record evidence establishing that, prior to the Town Hall Meeting of May 3, 2006 (or Plaintiff Kimball's meeting with Julie Cox on May 27, 2006), Employer Defendants seriously considered maintaining retirement medical benefits and/or offering severance packages under the new CBA.

### ii.     Significance of the Misstatements Compared to Internal Discussion

As in *Adams*, "[t]his factor is inapplicable because Plaintiffs have not offered any proof of internal discussions about [maintaining retirement medical benefits and/or offering severance packages under the new CBA]." *Adams*, 2008 WL 4527694, at *3. The Court would only add that, as previously stated, the record evidence establishes that, when Union Defendant and Employer Defendants held their first bargaining session, Employer Defendants submitted an additional proposal which sought to eliminate retiree medical benefits.

### iii.     Special Relationship of Trust

Plaintiffs argue that "there is at least a material question of fact as to whether Constellation 'personnel knowingly or actively misinformed plaintiffs about the availability of future benefits to induce them to retire earlier than they otherwise would.'" (Dkt. No. 87, Attach. 3, at 25 [quoting *Radley*, 19 F. Supp.2d at 101].)[35]  Plaintiffs further argue that "[t]his question of

_____

[35]     The Court notes that, in *Radley*, in analyzing the "special relationship of trust" factor, the court stated as follows:

> The plaintiffs voluntarily made appointments with the benefits counselors to discuss retirement benefits and voluntarily selected their own retirement dates. They were not forced to retire nor duped into retiring by Kodak or any of its representatives. Nor was there evidence that any of the counselors had any motive to misinform or deceive any of the retirees. Accordingly, the 'special relationship of trust and confidence' between the plan fiduciary and beneficiary was not abused by intentional deception. Kodak's representatives may have spoken improvidently by offering prognostications of the future which turned

fact is created by [the following: 1] Constellation's intention to eliminate job positions[; 2] Mr. O'Connor's misrepresentations[; 3] Human Resource Department's misrepresentations[;] and [4] Constellation's improper interpretation of the required retirement date, which forced the plaintiffs to elect retirement earlier than they should have had to, in contravention of established past practices under the collective bargaining agreement which Constellation assumed." (*Id*. at 25-26.)

As an initial matter, Plaintiffs' arguments fail to recognize that this factor examines solely whether Plaintiffs had a special relationship of trust with the individuals who made the alleged misrepresentations, such that Plaintiffs had every reason to rely, to their detriment, on the misrepresentations. *See Adams*, 2008 WL 4527694, at *3 & n.5 ("Plaintiffs fail to point to any facts suggesting that they had a special relationship with . . . Mr. Flood . . . [because, although] Plaintiff Aldrich testified that he 'had had dealings with Mr. Flood in the past and thought that he would be [sic] a more, perhaps, honest response than Mr. Mueller,' . . . the facts do not show what these dealings were or why Plaintiff Aldrich thought Mr. Flood would be more honest than Mr. Mueller."). After examining whether Plaintiffs had a special relationship of trust with the individuals who made the alleged misrepresentations, the Court finds that, as in *Adams*, "Plaintiffs have not presented any evidence of a special relationship of trust between Plaintiffs and [either] of the individuals who Plaintiffs claim made misrepresentations." *Adams*, 2008 WL 4527694, at *3.

---

out to be wrong. However, those predictions and opinions were offered only after being sought by the plaintiffs and when made, they did have a reasonable basis in fact.

*Radley*, 19 F. Supp.2d at 101.

More specifically, with regard to Tim O'Connor, Plaintiffs "have not offered evidence of any personal dealings with Mr. [O'Connor], nor do they explain how their relationship with [him] differed from the ordinary employer-employee relationship." *Adams*, 2008 WL 4527694, at *3. In addition, as in *Adams*, where the court found that "[the chief nuclear officer's] position as the highest ranking officer at Nine Mile Point tends to weigh against the existence of a special relationship," *Adams*, 2008 WL 4527694, at *3, Tim O'Connor's position as the Vice President of Constellation's site, where approximately 700 individuals are employed, likewise tends to weigh against the existence of a special relationship between Mr. O'Connor and Plaintiffs.

Similarly, with regard to Julie Cox, Plaintiffs have failed to offer evidence establishing that their relationship with her differed from the ordinary employer-employee relationship. Moreover, even assuming, based solely on her job title, that Ms. Cox had a special relationship of trust with Plaintiffs, their claim that this special relationship of trust was abused by intentional deception is without merit. As in *Radley*, Plaintiff Kimball voluntarily made an appointment with Ms. Cox (to discuss the retirement notification deadline), and voluntarily selected her own retirement date. Ms. Cox did not force her to retire or dupe her into retiring by informing her of the then-existing status of the negotiations. Furthermore, Plaintiffs have failed to introduce "evidence that any of the [members of the Human Resources Department] had any motive to misinform or deceive any of the[m]." *Radley*, 19 F. Supp.2d at 101. Accordingly, even assuming that (1) Ms. Cox was a fiduciary, and (2) a special relationship of trust existed between Ms. Cox and Plaintiff Kimball, "the 'special relationship of trust and confidence' . . . was not abused by intentional deception." *Id*. (noting that, while "Kodak's representatives may have spoken improvidently by offering prognostications of the future which turned out to be wrong . . . , those predictions and opinions were offered only after being sought by the plaintiffs and when made, they did have a reasonable basis in fact").

For these reasons, the Court finds that Plaintiffs have failed to adduce record evidence establishing that, before the Town Hall Meeting of May 3, 2006 (or Plaintiff Kimball's meeting with Julie Cox on May 27, 2006), Julie Cox and/or Tim O'Connor had a special relationship of trust with Plaintiffs that was abused by intentional deception.

### iv.   Information or Circumstances Minimizing the Misrepresentations' Effects

Plaintiffs implicitly argue that Tim O'Connor's misrepresentations were in no way minimized by any information or circumstances that they were exposed to because, "unlike in *Adams*, Mr. O'Connor never said, as Mr. Mueller did in *Adams*, that he did not know of any plans for early retirement programs." (Dkt. No. 87, Attach. 3, at 26.)

As an initial matter, contrary to Plaintiffs' implicit argument, at least one Plaintiff testified that Mr. O'Connor stated, essentially, that he did not know what benefits would be in the new CBA.[36]  Moreover, the uncontested record demonstrates that Plaintiffs were exposed to various information and circumstances at the time of the alleged misrepresentations.  More specifically, at the time of the alleged misrepresentations, Plaintiffs were aware of the following: (1) the old CBA was set to expire on June 30, 2006; (2) a staffing study conducted in 2005 and released at a meeting in February 2006, revealed that Constellation intended to significantly reduce staffing; (3) in response, Local 97 had prepared a VERP to provide a monetary incentive for senior employees to voluntarily leave Constellation; (4) Local 97 had submitted a cost analysis of the VERP to Constellation; (5) bargaining sessions regarding a new CBA were about to begin; (6) as a result, Local 97 had screened bargaining proposals presented by the membership; (7) there was an ongoing dispute between Local 97 and Constellation regarding the

---

[36]     (*See* Dkt. No. 81, Attach. 20, at 17 [Clark Dep. Tr.] [testifying that Mr. O'Connor stated, "along the line[s]" that, "if you're eligible to retire . . . you probably should because [Constellation] can't guarantee any benefits in the next contract"].)

retirement notification deadline; (8) Constellation had notified represented employees contemplating retirement that they had to retire by May 31 to receive the retirement benefits provided in the old CBA; (9) Constellation and Local 97 were not in agreement regarding the need for staff reductions; (10) there were rumors that Constellation may merge with another company;[37] (11) there was a possibility that legislation could effect retirees' pension benefits;[38] and (12) there was a possibility that pension benefits would decrease because of a change in the treasury bill.[39]

Certainly, rumors about various happenings that could impact retiree benefits would have effected each Plaintiff's decision to retire. In addition, uncertainty regarding staff reductions, as well as the possibility for Local 97 to make concessions with regard to certain issues in order to advance others, would have effected each Plaintiff's decision to retire. Furthermore, the fact that these alleged misrepresentations occurred prior to formal negotiations regarding the new CBA should have tempered the effects of the statements because, as with any negotiation, parties frequently change their positions. Therefore, even assuming that Mr. O'Connor definitively stated that he was aware of Constellation's plans for early retirement programs (which did not include severance packages or medical benefits), no rational factfinder could conclude that the importance of these alleged misrepresentations were not minimized by the information that Plaintiffs were exposed to, as well as the fact that formal negotiations over a new CBA had not yet commenced.

---

[37]      (Dkt. No. 81, Attach. 19, at 15 [Adams Dep. Tr.].)

[38]      (Dkt. No. 81, Attach. 19, at 15 [Adams Dep. Tr.]; Dkt. No. 81, Attach. 19, at 62 [Borden Dep. Tr.].)

[39]      (Dkt. No. 81, Attach. 19, at 29 [Annorino Dep. Tr.].)

For these reasons, the Court finds that Plaintiffs have failed to adduce record evidence establishing that, prior to retiring, they were not exposed to information or circumstances that would have minimized the effects of the alleged misrepresentations.

### v.    Specificity

Plaintiffs argue that "Mr. O'Connor's misrepresentation in this case was very specific." (Dkt. No. 87, Attach. 3, at 26.)  "He clearly stated to those assembled at the town hall meeting that there would be no severance packages in 2006. . . . This was not a general statement[, but] . . . a specific statement[] tailored to Constellation's [then-]current business situation . . ., that severance packages would not be included in the [new CBA]."  (*Id.*)

"A guarantee implies that current facts support it-in this case, that [Constellation] had made a decision not to [offer severance packages in 2006 or retirement medical benefits]-and if the guarantee necessarily misrepresents such facts it may be materially misleading."  *Ballone*, 109 F.3d at 125.  However, "the guarantee must be realistic."  *Ballone*, 109 F.3d at 125 (noting that, "[i]n most circumstances, an employee probably cannot rely upon a representation that the employer has decided never to alter its benefits package, for example, because such a statement is too speculative and unbelievable to 'mislead a reasonable employee in making an adequately informed decision about if and when to retire'") (citation omitted).

As an initial matter, Plaintiffs have failed to adduce record evidence establishing that Mr. O'Connor's statement came in the form of a guarantee (as opposed to a misprediction about future benefits, which is not actionable).  *See Ballone*, 109 F.3d at 125 ("Whereas mere mispredictions are not actionable, false statements about future benefits may be material if couched as a guarantee, especially where . . . the guarantee is supported by specific statements of fact.").  Moreover, Plaintiffs have failed to adduce record evidence establishing that, at the time

45

Mr. O'Connor stated that Constellation would not be offering severance packages in 2006 or retirement medical benefits under the new CBA, Employer Defendants' position was actually to the contrary.  In any event, given that negotiations regarding the new CBA had yet to commence, a guarantee regarding the inevitable outcome of the negotiations is unrealistic, to say the least. Accordingly, even assuming that Mr. O'Connor's statement came in the form of a guarantee, it would not have been reasonable for Plaintiffs to rely on Mr. O'Connor's alleged "guarantee."

For these reasons, the Court finds that Plaintiffs have failed to adduce record evidence establishing that Mr. O'Connor provided Plaintiffs with a guarantee that, on or before May 3, 2006, Constellation had made a decision not to offer severance packages in 2006 or retirement medical benefits under the new CBA, which misrepresented the facts at the time of the alleged guarantee.[40]

### 2.    Conclusion

After reviewing all of the factors relevant to the determination of whether Employer Defendants' misrepresentations were material, the Court concludes, as a matter of law, that the alleged misrepresentations would not have induced a reasonable person to rely on them.  As a result, the Court grants Employer Defendants' cross-motion for summary judgment with respect to Plaintiffs' ERISA breach-of-fiduciary-duty claims on the ground that Employer Defendants' alleged misrepresentations are not material, and denies Plaintiffs' cross-motion.

---

[40]    The Court would only add that, even if it were to find that Mr. O'Connor's statements (1) were sufficiently specific, and (2) misrepresented the facts at the time they were made, "this would not, alone, support a finding of materiality."  *Adams*, 2008 WL 4527694, at *5 (citing *Broga v. Nebraska Util.*, 315 F. Supp.2d 212, 249 [D. Conn. 2004] [opining that "the specificity of assurance factor is less important than the other [materiality] factors"]).

**ACCORDINGLY,** it is

**ORDERED** that Union Defendant's motion for summary judgment (Dkt. No. 73) is

**<u>GRANTED</u>**; and it is further

**ORDERED** that Employer Defendants' cross-motion for summary judgment (Dkt. No. 81) is **<u>GRANTED</u>**; and it is further

**ORDERED** that Plaintiffs' cross-motion for summary judgment (Dkt. Nos. 79) is

**<u>DENIED</u>**; and it is further

**ORDERED** that Plaintiffs' Amended Complaint (Dkt. No. 16) is **<u>DISMISSED</u>**.

Dated: September 30, 2010
      Syracuse, New York

Hon. Glenn T. Suddaby
U.S. District Judge